# EXHIBIT 1



# PROPOSAL FOR THE SUPPLY OF A DIGESTATE TREATMENT SYSTEM FOR 30 MILLION GALLONS ANNUALLY

Prepared For:

## BIOTOWN AG

Date: 14 January 2013



**Livestock Water Recycling, Inc.**
**3637 – 44th Avenue SE**
**Calgary, Alberta**
**T2B 3R5**



# TABLE OF CONTENTS

## SCOPE OF PROPOSAL ................................................................. 3

| 1.1 | CUSTOMER REQUIREMENTS & EXECUTIVE SUMMARY ...................3 |
| 1.2 | SCOPE OF SUPPLY ................................................................4 |
| 1.3 | PROJECT MANAGEMENT AND OPERATION.....................................5 |
| 1.4 | CONSUMABLES REQUIRED ....................................................8 |

## CONTRACT DOCUMENTATION............................................... 9

| 1.5 | PRICING .........................................................................9 |
| 1.6 | DELIVERY SCHEDULE ...........................................................9 |
| 1.7 | ESTIMATED OUTPUTS ...........................................................10 |



Before & After



Dry Solids



System Site

*Biotown Ag*
*Proposal for the Supply of a Digestate Treatment System for 30 Million Gallons Annually*

**Livestock Water Recycling, Inc.** | www.livestockwaterrecycling.com | (403) 203-4972



## SCOPE OF PROPOSAL

### 1.1   CUSTOMER REQUIREMENTS & EXECUTIVE SUMMARY

Biotown Ag operates a mixed waste bio-digester in Reynolds, Indiana, that currently produces 30 million gallons of digestate annually. This project is a part of Biotown, U.S.A., which is a project in partnership with the Indiana State Department of Agriculture, White County, and the citizens of Reynolds to make a community that is energy self-sufficient.  The existing digestate management system requires that the digestate be hauled onto neighbouring land, at a cost of $0.02/gallon. Biotown Ag would like to extract the water from the digestate in order to reduce the volume and hauling costs. This will be accomplished by the addition of a LWR system.

With the introduction of a Livestock Water Recycling (LWR) System, the digestate will be segregated into its constituent parts for more efficient use. Firstly, the System will recycle approximately 75% of the original volume of digestate into clean water. Secondly, the nutrients in the digestate will not be destroyed by the LWR System, but instead concentrated and separated into two different products.  Approximately 15% of the original volume will be concentrated into a liquid nutrient, which will consist of ammonia and potash. The other product will be a pileable solid, approximately 10% of the original volume. This material will be high in phosphorus and nitrogen; this solid can be mulched or composted.

The following tables are an executive summary of this information.

**Current Digestate Management System at Biotown Ag:**

| | |
|---|---|
| Current Volume of Digestate Produced Annually (gallons) | 30 Million |
| Current Cost of Hauling Digestate (@USD $0.02/gallon) | $600,000 |

**Biotown Ag Digestate Management with the Implementation of a LWR Digestate System\*:**

| | |
|---|---|
| Volume of Water Recovered Annually (gallons) | 22,500,000 |
| Volume of Liquid Nutrient Concentrate Produced Annually (gallons) | 4,500,000 |
| Volume of Solid Produced Annually (gallons) | 3,000,000 |
| Cost of Treatment (@USD $0.015/gallon) | $450,000 |

\* All values are approximate.



## 1.2   SCOPE OF SUPPLY

LWR is to supply the base equipment system mounted on skids. Any customer supplied peripheral tankage or process equipment should be located adjacent to the process skid.

The system has a number of features that will improve the operations of a confined animal feeding operation.

The system treats liquid digestate to produce solids, liquid concentrate and clean water. The features of the system are plentiful and the impact on an operation is significant. With treatment, 75% of the currently produced liquids are recovered as clean water. Additionally, nutrients are segregated and concentrated.

| Feature | Benefit |
|---|---|
| Process reduces odour in digestate liquids. | Reduced impact from storage and application issues for owners, neighbours and employees. |
| Process concentrates the liquids to 15%. | Liquids are less expensive to handle, store, transport and apply. Fewer trucks on the road reduces liability and neighbour issues. Storage and land base issues are eliminated. |
| Process segregates and concentrates Nutrients. | Ensures the operator can balance the application of nutrient from digestate. Applications are efficient and valuable while the land base is protected from over application |
| Process is automated and can be remotely monitored. | Minimizes the amount of time required for the operator to operate the system. The system reduces management and farm labour currently associated with digestate management activities. |
| Ammonia and potash are concentrated by five to six times in a clear liquid. | Allows the material to be economically transported and sold or used appropriately as a replacement for purchased fertilizer. Issues related to ammonia hazards are reduced |
| System concentrates material into a reliable consistent product. | Ensures an operator is in compliance regarding nutrient applications. |
| Ammonia is captured at the site. | Ammonia levels will be significantly increased and fertilizer value will be increased. |

The comprehensive equipment scope will contain a set of detailed drawings along with installation instructions to Biotown Ag. This information is to provide a basis for installation of a building, equipment placement in the process area and insure that the installation crew can make all connections properly.



The skid structure is suitable for placement on the concrete pad inside the building provided by Biotown Ag. It is recommended the pad include containment and drainage to a sump. The customer is to also supply a solids drying area as well as a solid storage facility. The storage facility can be field or pad storage.

For complete equipment installation, it will be necessary for the customer to provide a suitable level pad, water supply, ventilated building, electrical and plumbing.  The system requires a constant supply of homogenous fresh digestate.

LWR supplies the design, the equipment and the oversight to make sure the LWR System is installed efficiently and economically by your local trusted trades person.

## 1.3  PROJECT MANAGEMENT AND OPERATION

LWR has a long history of providing excellent equipment and service to locations across Canada, the United States and internationally. We make sure equipment is operating properly and that there is local support for the equipment system operation. As well we provide a comprehensive operating manual, internet interface with the LWR office and thorough training. LWR is available daily to provide any necessary support such as technical questions, troubleshooting, and after-sales answers or assistance.

Our service includes extensive preparatory testing and laboratory work. This work is then used to provide a smooth start up and efficient operations.

At the start of the project, LWR reviews the lab testing, the site conditions and the detailed work plan with the customer. A detailed schedule of the work and anticipated timing is described to the customer. Additional liquids testing may also be completed at this time. Moreover, LWR travels to the site to assist in identifying necessary site preparation to the customer and its contractor.

The equipment is loaded and shipped to site by LWR. The customer contractor completes placement, set up and installs all mechanical connections, and any electrical installation. LWR can be on-site for this work but it is usually a straight forward process and we are not required.

LWR will be on site for the initial commissioning of the system.  LWR's technician is to provide start-up, commissioning and training services.  These include:

- On-site performance testing

- Functional verification of all safety & control systems

- Initial system monitoring and optimisation after start-up

- Training of client personnel on system start-up, shutdown and maintenance and operational activities

- Ongoing phone, online and site support as required by the user

5



In summary; LWR manufactures, ships, and delivers the complete skid mounted system to the customer's location.  LWR then arrives at the site to provide installation assistance. LWR will assist the customer's contractor in placing, installing, and interconnecting all on-site electrical and mechanical systems.  Finally, LWR commissions the system and trains the operators before providing on-going support so that the system operation is smooth and reliable. A local contractor is also trained to be able to provide local support. All parts are available from inventory or a local supply. LWR maintains an online and telephone support network for ongoing support.

### 1.3.1     Operation and Maintenance

The system process is designed to operate in an automated reliable fashion.

The LWR features a design that will operate in such a way that current labour required to manage and spread digestate is reduced to two hours per day and Biotown Ag has control over production previously delayed by digestate issues. Thus, the operation will no longer be impacted by shortages in labour, storage or land availability.

The operation of the LWR treatment system has several objectives.

- *The system is to operate continually in an automated fashion*

- *Production of a fertilizer liquid derived from the ammonia and potash nutrients in the digestate.*

- *Production of a solid material rich in organics, phosphorus and organic nitrogen. These solids can be sold directly or, with the addition of a carbon source, composted.*

- *Production of clean potable water.*

The system has an automated shut down which is engaged when the system is not working efficiently. In this event, the data is recorded and made available to the operator.



### 1.3.2    Tasks

The following is a list of some of the items (examples) that are required to operate one of these systems. It should not be considered a comprehensive list of activities. All operation and maintenance activities are to be provided by the customer.

- ✓ Complete daily check list and log sheet and submit online to LWR website
- ✓ Record all readings and keep  system in adjustment
- ✓ Remove recovered fertilizer solids and store in segregated pile for use
- ✓ Check and supply chemical to system as required
- ✓ Monitor and backwash filters/change bag filters as required
- ✓ Clean all process equipment as needed
- ✓ Remove to storage or use the ammonium solution – liquid fertilizer
- ✓ Remove to disposal solids generated from the system
- ✓ Maintain and lubricate pumps as required
- ✓ Ensure all flow and level instrumentation functioning correctly
- ✓ Membrane flushing
- ✓ Ensure all OEM maintenance items are complete
- ✓ Clean any process equipment thoroughly as required
- ✓ Remove solids accumulated in vessel bottoms
- ✓ Ensure that the membranes are clean and maintained

### 1.3.3    Safety Considerations

Safety is of paramount importance to LWR.  The safe work procedures followed by our field service technicians and manufacturing staff, and our safety record, are available upon request. All of our field technicians are trained in WHMIS and TDG.  Additionally, LWR technicians are familiar with LWR safety rules and procedures.

**Methane gas and ammonia gas is a potential by-product of the operation. The customer supplied HVAC system should be suitable and building monitoring may be installed by customer.**



## 1.4  CONSUMABLES REQUIRED

The following consumables are required to run a LWR Digestate Treatment System.  Please note that the pricing of consumable may be adjusted periodically time in response to fluctuations in market pricing.  However, a notification of any price changes will be given thirty days in advance.

### 1.4.1  Chemical

Chemical conditioners are required for operation of LWR Digestate Treatment Systems.  These are supplied as per LWR's standard inventory or via our specified suppliers. The materials are to be delivered in a combination of bulk, tote or drums. LWR has completed testing of material from Biotown Ag to define the treatment protocol and the estimated cost of this treatment. It is anticipated your costs will be between 0.7 of a cent and 2 cents per gallon. We can supply testing data if requested. As well we can generate a model of the expected outputs. Testing indicates the chemical consumption for this will be USD $0.015 - $0.018/gallon based on lab testing material submitted by Biotown Ag.

### 1.4.2  Filters

Filters are a consumable required for operation of a LWR Digestate Treatment System.  Filters are supplied as per LWR's standard inventory.



Digestate Separation



Digestate Testing



System Equipment

*Biotown Ag*
*Proposal for the Supply of a Digestate Treatment System for 30 Million Gallons Annually*

**Livestock Water Recycling, Inc.** | www.livestockwaterrecycling.com | (403) 203-4972



# CONTRACT DOCUMENTATION

## 1.5  PRICING

### 1.5.1      Purchase Pricing

| Model #: | Annual Capacity: | Price: |
|----------|------------------|--------|
| LWR-40 | 30 Million Gallons | USD $853,000 |
| LWR-40 (Refurbished) | 30 Million Gallons | USD $753,000 |

Freight, Commissioning, training and miscellaneous services are charged on a cost plus basis. Assumes that storage is available for solids and fertilizer concentrates.

The amount of chemical used depends on digestate composition and is subject to digestate analysis and bench scale treatment.

## 1.6  SCHEDULE

Equipment is to be shipped 150 days or less from the date of deposit payment and five days from receipt and acceptance of final progress payment. Delays in progress payments will delay the equipment delivery.

Commissioning will take approximately one month from the time the electrical and piping connections are made.

Training will take approximately two weeks following the commissioning period.



## 1.7  ESTIMATED OUTPUTS

### 1.7.1      Clean Water

The LWR System is automated to provide a source of potable water. The system is to produce approximately seventy-five percent (75%) of the influent as clean water.

### 1.7.2      Concentrate Solution

The LWR Primary System is to concentrate the digestate into a solution of approximately fifteen percent (15%) of the original volume of digestate. This will primarily contain water, ammonia and potash.

### 1.7.3      Solids

A pileable solid sludge, rich in nutrient, will be generated. The volume of this will be approximately ten percent (10%) of the influent digestate. This will contain the majority of the phosphorus and organic nitrogen as well as some ammonia and potash.

*Biotown Ag*
*Proposal for the Supply of a Digestate Treatment System for 30 Million Gallons Annually*

**Livestock Water Recycling, Inc.** | www.livestockwaterrecycling.com | (403) 203-4972



## STANDARD TERMS AND CONDITIONS OF SALE

**1. ENTIRE AGREEMENT** – These Standard Terms and Conditions of Sale supersede any previous terms and conditions in any communications, representations, or agreements, whether oral or written. Save as set out in Clause 2 below, these Standard Terms and Conditions of Sale shall apply to any contract concluded (the "Contract") with the person procuring equipment (which term shall include goods, parts, materials and plant, etc., as appropriate) and/or services (the "Purchaser"), to the exclusion of all other terms and conditions inconsistent herewith.

**2. SCOPE** – These Standard Terms and Conditions of Sale govern the sale of equipment and/or services by Livestock Water Recycling, Inc, IWR Technologies Ltd, or their divisions or subsidiaries, as the case may be, (the "Seller") to the Purchaser, whether the Contract for such sale is concluded by acceptance by the Seller of the Purchaser's purchase order or by acceptance by the Purchaser of the Seller's proposal. Any additions to or modifications of these Standard Terms and Conditions of Sale, or any terms and conditions in a purchase order inconsistent herewith, shall not bind the Seller unless agreed to or accepted by the Seller in writing and that by an authorized representative of the Seller.

**3. PRICE AND PAYMENT** – Unless otherwise agreed, the prices in the Contract (in aggregate the "Purchase Price") are those specified in the Seller's proposal. The Purchase Price(s) are firm, however, the Seller shall be entitled to increase such prices to take account of cost escalation in the event that delivery of the equipment and/or services is delayed beyond standard delivery schedules for reasons outside of the control of the Seller and/or to take account of foreign currency fluctuations where the same differ from currency exchange assumptions in the Seller's proposal. Unless otherwise agreed, payment of the Purchase Price(s) shall be in accordance with the Seller's proposal or, where the due date(s) for payment is not so specified, payment shall be due on delivery of the equipment and/or on completion of the services, as the case may be. If the Purchaser defaults in any payment when due, the Seller, without incurring any liability to the Purchaser or any other party, may, at its option and in addition to other remedies available, declare all work complete with payment immediately due and payable with interest charges of 1% per month in excess of the Canadian prime bank rate on all outstanding amounts due therein; stop all further work and deliveries until all past due payments have been made and/or require that any further deliveries be paid for prior to shipment. If requested by the Seller, the Purchaser shall obtain a bond or other security to provide guarantees of payment to the Seller. Terms are 30/40/20/10.

**4. CREDIT** – All Contracts are subject to credit terms net 30 days from invoice date unless otherwise agreed by the Seller. The Seller reserves the right to stop all work and refuse delivery of equipment if, in its reasonable opinion, doubt exists as to the Purchaser's payment capability. The Seller shall not be liable in such event for delayed or non-delivery in whole or part, as the case may be.

**5. ITEMS INCLUDED** – The Contract includes only the equipment or service specified therein and, unless otherwise specified in the proposal, does not include installation, start up assistance, or the provision of accessory or associate materials. The Seller assumes no liability or responsibility for the proper operation of equipment not installed and operated in accordance with the Seller's specifications and instructions.

**6. TAXES, DUTIES AND LICENSES** – Any federal, provincial/state or local sales tax or other taxes applicable to the Contract and imposed on or required to be collected by the Seller, if not stated as included in the Purchase Price, shall be added to the same and charged to the Purchaser's account. Unless otherwise stated, the Purchaser shall additionally pay all duties, tolls, and import taxes and provide any necessary import licenses and extensions thereof applicable to the Contract.

**7. SECURITY INTEREST** – The Seller shall retain ownership and title of any equipment sold until payment in full of the Purchase Price or corresponding price, as the case may be, is received from the Purchaser. For services rendered, the Purchaser will be liable for the amount equal to the value of the services rendered until payment in full is made. The Purchaser shall protect the Seller's title and right of possession to the equipment specified in the Contract, including that in any variation to the Contract until the full Purchase Price has been paid, and will not permit the encumbrance of the equipment by any liens or security interest. The Purchaser acknowledges that as security for payment of the Purchase Price, the Purchaser grants, and the Seller shall retain, a security interest in all equipment sold by the Seller to the Purchaser and agrees to co-operate in any registration of that interest. The Seller shall also retain all of its rights and remedies as a seller and a secured party under the law. No waiver by the Seller of any default shall constitute a waiver of any subsequent default. The Seller may retain as liquidated damages for breach of the Contract any partial payments made and may peaceably repossess the equipment from the Purchaser's premises without prejudice to any further claims. In the event that legal action is necessary to enforce these provisions, the Seller shall be entitled to recover its court costs and reasonable attorney's fees, if it prevails.

**8. INSURANCE** – From date of delivery until the invoice is paid in full, the Purchaser agrees to provide and maintain at its expense for the Seller's benefit, insurance adequate to fully protect the Seller's interest in the equipment against any loss or damage thereof of any nature whatsoever.

**9. SHIPMENTS AND DELIVERY** – Performance of the Contract is contingent upon the Purchaser supplying to the Seller, when needed, all required technical information, including drawing approval and all required commercial documents. The Seller shall use reasonable effort to meet all delivery dates stated in the Contract but, unless otherwise agreed, any such dates are estimates only and are not guaranteed. Accordingly, the Seller shall have no liability to the Purchaser for damages or penalties, direct or indirect, of any delay in delivery, whether such delay is minor or substantial, nor shall the Purchaser have the right to declare a breach of the Contract because of any such delay. Unless otherwise agreed, the Seller shall have the right to make partial deliveries. Unless otherwise specified, delivery of the equipment shall be ex-works the point of delivery (which unless otherwise specified shall be the Seller's normal place of business) and risk of loss or damage is the responsibility of the Purchaser upon uplift by the carrier. All claims for damages, delay or shortage arising from any shipment shall be made directly against the carrier by the Purchaser. The Purchaser shall inspect the equipment at or prior to uplift from the point of delivery, failing which, within one working day of receipt, and immediately notify the Seller of any visual damage to or shortage of the equipment. Failure to notify the Seller as stated shall constitute acceptance by the Purchaser of the equipment and relieve Seller of any liability for any such alleged damage or shortage. If the Seller has agreed to deliver the equipment other than ex-works and shipment is postponed by or due to the Purchaser's delay or request, the Seller may tender delivery and store the equipment at the Purchaser's expense and risk. Such tender shall constitute delivery and the full Purchase Price for the equipment tendered shall be immediately due and payable.

**10. CANCELLATION, SUSPENSION, DELAY** – In the event that the Purchaser instructs, issues, requests or causes a cancellation, suspension, or delay in any of the Seller's work under the Contract, the Purchaser shall pay to the Seller by way of compensation, all additional charges incurred by the Seller as a result of such instruction, issuance, request or cause, including but not limited to any costs, liabilities and expenses incurred as a result of the same and with respect to commitments incurred by the Seller up to the date of receipt of notice of such cancellation, suspension, or delay, plus the Seller's overhead and reasonable profit. If shipment is delayed on account of the

11



Purchaser, the Purchase Price shall be due and payable as if delivery had been made. Additionally all charges related to storage, disposition and/or resumption of work, at the Seller's plant or elsewhere, shall be for the Purchaser's sole account and all risks incidental thereto shall be assumed by the Purchaser.

**11. FORCE MAJEURE** – If the occurrence of an event of Force Majeure causes (a) shortages, (b) significant increases in the price of commodities, (c) an unavailability of materials or components used by the Seller in the provision of the equipment and/or the services, or (d) delays, the Seller shall be at liberty to extend the delivery schedule to such extent as the Seller in its absolute discretion sees fit. The Purchase Price may be adjusted at the Seller's discretion to compensate for the changes in the Seller's costs and expenses as a direct result of such Force Majeure. For purposes of this Section, "Force Majeure" means any cause beyond the reasonable control of the Seller, including, but not limited to, elements of nature, acts of God, strikes, lock-outs or other labour or industrial disturbances, accidents, fires, floods, earthquakes, explosions, extreme weather conditions, delays in transportation, war, embargo, civil commotions or disturbances, riots, sabotage, acts of terrorism and interruptions by government or court orders and future orders of any regulatory body of competent jurisdiction.

**12. LIMITATION OF LIABILITY** – THE SELLER SHALL NOT BE LIABLE IN CONTRACT, TORT, STRICT LIABILITY, WARRANTY, OR OTHERWISE TO PURCHASER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES FOR ANY REASON WHATSOEVER INCLUDING, BUT NOT LIMITED TO, LOSS OF ANTICIPATED PROFITS OR REVENUES, LOSS OF USE, LOSS OF PRODUCTION, NON-OPERATION OF OTHER EQUIPMENT, COST OF CAPITAL, COST OF PURCHASED OR REPLACEMENT POWER AND/OR FACILITIES, DAMAGE TO ENVIRONMENT, OR CLAIMS OF CUSTOMERS OF THE PURCHASER FOR DAMAGES. The liability of the Seller with respect to any and all claims arising out of the performance or non-performance of the services or equipment supplied under the Contract whether in contract, tort, warranty, strict liability or otherwise, shall not exceed the Purchase Price.

**13. WARRANTY** – The Seller warrants that the equipment manufactured by it shall be free of defects in materials or workmanship within one year following initial commissioning or 12 months after delivery, whichever event comes first. Should any failure to conform to this warranty be reported to the Seller within the said period, upon prompt notification thereof and provided the equipment has been stored, installed, erected, maintained, and operated in accordance with good industry practice, the Seller shall replace or repair, ex-works its factories or other designated location, equipment that fails to conform to this warranty. Such repair or replacement shall be free of charge for all items except for those that are worn or consumed through normal use and/or maintenance with respect to which repair or replacement shall be subject to prorated charges based upon the Seller's estimate of the percentage of normal service realized. The Seller warrants that repair, refurbishment, and installation work performed by the Seller's service centers, shall be free of defects arising from workmanship and/or materials for a period of 90 days from the date of start-up or 90 days after delivery, whichever event comes first. The Seller does not warrant old material, free issue material, or any workmanship tying old material with new material. With respect to accessory and other vendor furnished apparatus included, the Seller shall be responsible for their proper selection and specification requirements to the suppliers. Warranties for such items are limited to those extended to the Seller by the manufacturers. THIS WARRANTY IS EXPRESSLY MADE BY THE SELLER AND ACCEPTED BY THE PURCHASER IN LIEU OF ALL OTHER WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE, WHETHER WRITTEN, ORAL, EXPRESSED, IMPLIED, OR STATUTORY. THE SELLER NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME ANY OTHER LIABILITIES WITH RESPECT TO ITS EQUIPMENT ON ITS BEHALF. This Warranty shall not apply to equipment or parts which have been altered or repaired outside of the Seller's authorized facility, or installed or operated other than in accordance with the Seller's

instructions, or subjected to misuse, abuse, neglect, or accident. Correction of non-conformities whether patent or latent in the manner provided above shall constitute the entire liability of the Seller with respect to such equipment or services, whether based on contract, tort, strict liability or otherwise.

**14. INDEMNIFICATION** – The Purchaser hereby indemnifies and shall defend and hold harmless, the Seller, its employees, subsidiaries, affiliates, and authorized representatives from and against all suits, actions, legal or administration proceedings, claims, demands, damages, liabilities, interest, attorney's fees, costs and expenses of whatever kind or nature including injury to or death of the Purchaser's employees arising from or due to the Purchaser's negligence or out of any negligent act or operation of the Seller's equipment including the failure to follow proper operating instructions and/or warnings relating to the Seller's equipment.

**15. NUCLEAR INDEMNITY** – The Purchaser represents and warrants that the equipment covered by the Contract shall not be used in or in connection with a nuclear facility or operation unless approved and accepted by the Seller for such use.

**16. CHANGES** – Any extra costs or expenses associated with changes in or additions to the scope of work which are initiated by the Purchaser or by circumstances beyond the Seller's control shall be borne by the Purchaser.

**17. PROPRIETARY INFORMATION** – All information forwarded by the Seller is submitted solely for the Purchaser's consideration and requires that the Purchaser and its servants, agents, representatives, advisers, associates, and contractors shall not disclose information to any third party without the Seller's prior written consent.

**18. CHANGES IN DESIGN** – The Seller reserves the right to change or modify the design and construction of any equipment in order to incorporate improvements or to substitute material equal or superior to that originally specified. The design change will be clearly defined to the Purchaser.

**19. BANKRUPTCY** – In the event of any proceedings in bankruptcy or insolvency, or if the Purchaser assigns assets for the benefit of creditors or undergoes a substantial deterioration of its financial condition, the Seller may, at its sole option, declare a breach of the Contract, stop all work under the Contract, or demand payments in advance as security for its performance under the Contract.

**20. REMEDIES** – The remedies of the Purchaser set forth herein are exclusive.

**21. ASSIGNMENT** – The Purchaser shall not assign the Contract, nor any interest therein or rights there under, without the prior written consent of the Seller.

**22. BACK CHARGES** – The Seller will not approve or accept returns or back charges for labour, material, transportation, in and out, or other costs incurred by the Purchaser, or others, in modification, adjustment, service or repair of equipment furnished by the Seller unless such returns or costs have been previously agreed to by the Seller in writing. In no event shall the remedy for alleged costs or replacement of item(s) irrespective of whether such defects are discoverable or latent, exceed the Purchase Price of the particular item(s).

**23. GOVERNING LAW** – The Contract shall be governed by the laws of the Province of Alberta and the laws of Canada applicable therein. Any litigation between the parties shall be brought and maintained exclusively in the Courts of the Province of Alberta and all Courts competent to hear appeals therefrom.

**24. WAIVER** – Any delay, neglect, indulgence, forbearance, or other non-exercise of rights on the part of the Seller in enforcing any terms or conditions of the Contract shall not constitute a waiver of such rights and shall not prejudice the rights of the Seller under the Contract.

**25. HEADINGS** – The headings to the sections of these Standard Terms and Conditions of Sale are inserted for ease of reference only and shall not be taken into account in the construction or interpretation of any provision to which they refer.

12

*Biotown Ag*
*Proposal for the Supply of a Digestate Treatment System for 30 Million Gallons Annually*